Santos CRUZ, Petitioner–Appellant,

v.

David MILLER, Superintendent,
Eastern Correctional Facility,
Respondent–Appellee.

No. 00–2005.

United States Court of Appeals,
Second Circuit.

Argued May 2, 2001.

Decided June 22, 2001.

Andrea G. Hirsch, New York, NY, for petitioner-appellant.

Kimberly Morgan, Asst. Dist. Atty., (Robert T. Johnson, Dist. Atty., Joseph N. Ferdenzi, Asst. Dist. Atty., Bronx, NY, on the brief), for respondent-appellee.

Before JON O. NEWMAN, and JOSÉ A. CABRANES, Circuit Judges, and UNDERHILL,* District Judge.

JON O. NEWMAN, Circuit Judge.

The issue on this appeal from a denial of a writ of habeas corpus is whether the state courts made an "unreasonable application" of clearly established Supreme Court law, see 28 U.S.C.A. § 2254(d)(1) (West Supp.2000), in determining that the circumstances under which a suspect was stopped and questioned on a public street did not result in "custody" requiring *Miranda* warnings. Santos Cruz appeals from the December 12, 1999, judgment of

---

* Honorable Stefan R. Underhill, United States District Court for the District of Connecticut,       sitting by designation.

the United States District Court for the Southern District of New York (Barbara S. Jones, District Judge) denying his habeas petition to challenge his state court conviction for murder. After surveying the somewhat uncertain state of the law concerning when a suspect is in "custody" for purposes of requiring *Miranda* warnings, we conclude that the rejection of Cruz's claim by the state courts was not an unreasonable application of clearly established Supreme Court law. We therefore affirm.

### Background

*The shooting and questioning.* At about 10:30 a.m. on March 26, 1992, two uniformed police officers received a report that an individual had been shot at 1105 Boynton Avenue, an area of the Bronx known for its drug activity. They proceeded to the scene of the crime, where they talked to two witnesses, Jose Alvarez and Luz Arroyo. Alvarez described the shooter as a six-foot tall Hispanic male, wearing a gray hat and black army jacket, who had fled in the direction of the Elder Avenue train station. The officers drove to the station, where they saw an elevated train heading eastbound. They followed the train by car, and at the third stop (Parkchester Station), they saw Cruz exiting the station. Cruz fit Alvarez's description of the shooter.

Officer Thomas Marsich approached Cruz with his gun drawn, and told Cruz, "Police! Don't move! Put your hands up!" The other officer, Paul Daly, also drew his gun. Marsich frisked Cruz, found no weapon, and reholstered his gun. Marsich called on his hand-held radio to the police at the scene of the shooting, asking them to bring the eye-witness to the train station.

Marsich then started to question Cruz without first informing him of his *Miranda* rights. At the state court pretrial hearing,

Marsich recounted the questioning as follows:

Officer Marsich: Where are you coming from?

Petitioner: The Soundview train station.

Officer Marsich: What were you doing down there?

Petitioner: Just copping some dope.

Officer Marsich: Where's the dope?

Petitioner: I did it.

Officer Marsich: Relax. Why are you crying?

Petitioner: I'm crying because you pointed your gun at me. I'm scared. I didn't do anything. I didn't do anything.

Officer Marsich: Okay, no problem. Where did you cop the dope?

Petitioner: I copped it on Stratford Avenue.

Officer Marsich: They don't sell dope on Stratford Avenue that I know of.

Petitioner: Okay. I bought it on Watson then.

Officer Marsich: Where on Watson?

Petitioner: You know, near the restaurant. Near the restaurant.

Officer Marsich: Where? Near Boynton?

Petitioner: No, not Boynton. Down near Wheeler.

Marsich explained that he was trying to use this line of questioning to calm Cruz, who was shaking and very upset throughout the conversation. There were apparently four or five other officers gathered near Cruz when he was being questioned, but it is unclear where they were located relative to Cruz. Cruz was not physically restrained in any way during the questioning. Marsich and Daly acknowledged that had Cruz tried to walk away, they would not have allowed him to leave, but they did

not tell this to Cruz during the questioning.

The conversation ended when the police car containing Alvarez arrived. After one of the officers nodded to Marsich that Alvarez had identified Cruz, Marsich spoke to Alvarez, arrested Cruz, and then informed Cruz of his *Miranda* rights.

Huntley *Hearing and Trial.* Cruz was charged with second-degree murder and related crimes. At a pretrial *Huntley* hearing, see *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), in the New York State Supreme Court, Cruz argued that the questioning at the train station was custodial interrogation conducted without *Miranda* warnings and that his responses should therefore be excluded at trial. The Supreme Court rejected the claim. The Court reasoned that the questioning was not an "interrogation" but rather "investigatory in nature," since the "police officers did not know whether they actually had the right person," and the inquiry was "prior to the time that the show up was conducted for the purpose of the identification." The Court did not explicitly determine whether the circumstances of the questioning resulted in "custody" for purposes of *Miranda.*

At trial Arroyo and Alvarez testified that Cruz was the shooter. Officer Marsich testified as to his questioning of Cruz at the train station. Before he testified, defense counsel, having lost his *Miranda* challenge, moved to exclude Cruz's statements on the ground that they concerned an uncharged crime. The Court denied the motion, holding that the statements were relevant to show that Cruz had a "guilty mind in trying to obfuscate his whereabouts in the previous half hour . . . and to put himself in a location other than where the crime was committed."

The jury acquitted Cruz of second-degree murder but convicted him of first-degree manslaughter. Cruz was sentenced to an indeterminate sentence of 12 ½ to 25 years.

*State Court Appeals.* Cruz appealed to the Appellate Division, arguing again that his statements at the train station should have been suppressed. The Appellate Division affirmed the trial court's decision to admit the statements, ruling that "[t]he record supports the hearing court's finding that defendant's statements were not the product of custodial interrogation." *People v. Cruz*, 233 A.D.2d 102, 102, 649 N.Y.S.2d 429, 430 (1st Dept.1996). The Court of Appeals affirmed on the ground that the Appellate Division's "ruling constitute[d] a determination on a mixed question of law and fact" and was thus "beyond" its "further review." *People v. Cruz*, 90 N.Y.2d 961, 962, 665 N.Y.S.2d 46, 47, 687 N.E.2d 1329 (1997).

*Habeas petition.* Cruz then filed a habeas petition in the Southern District of New York, again arguing that he had been unconstitutionally convicted on evidence that should have been suppressed under *Miranda.* Magistrate Judge Andrew J. Peck did not determine whether Cruz had been subjected to custodial interrogation, but recommended that even if that had occurred, any error in admitting the statements should be considered harmless because it lacked a "substantial and injurious effect or influence in determining the jury's verdict," as required by *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted), for issuance of habeas relief. Judge Jones adopted the Magistrate Judge's recommendations, agreeing that any error in failing to suppress the interrogation was harmless in light of the testimony of the two eyewitnesses. *Cruz v. Miller*, No. 98 Civ. 4311 BSJ, 1999 WL 1144280 (S.D.N.Y. Dec.2, 1999).

## Discussion

Although the District Court denied relief on the ground that, if there was error, it was harmless, we need not reach the harmlessness issue, which would require a careful assessment of the significance of Cruz's responses during the sidewalk interrogation against the totality of the evidence, including the probative force of the eye-witnesses' testimony and the extent to which that force was diminished by substantial attacks on their credibility.[1] Instead, we resolve the appeal by considering the issue on which the state courts rested their decision: whether Cruz was subjected to custodial interrogation requiring *Miranda* warnings. In considering that issue, we bear in mind that, although "custody" for purposes of *Miranda* warnings is a mixed question of law and fact as to which state courts were owed no deference prior to AEDPA, *see Thompson v. Keohane,* 516 U.S. 99, 112–16, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), after AEDPA habeas corpus may not be granted

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an *unreasonable application* of, clearly established Fed-

eral law, as determined by the Supreme Court of the United States; . . . .

28 U.S.C.A. § 2254(d)(1) (emphasis added). Thus, our task is to determine whether the state courts, in ruling that the sidewalk questioning of Cruz did not have to be preceded by *Miranda* warnings, "unreasonably appli[ed]" Supreme Court law.[2]

In rejecting Cruz's claim because his responses were "not the product of custodial interrogation," the state courts were ambiguous as to whether they meant that *Miranda* warnings were not required because the circumstances of the sidewalk questioning did not constitute "custody," *compare Miranda v. Arizona,* 384 U.S. 436, 465, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (circumstances of police station questioning constituted "custody" requiring *Miranda* warnings), *with Berkemer v. McCarty,* 468 U.S. 420, 440–42, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (circumstances of traffic stop questioning did not constitute "custody" requiring *Miranda* warnings), or because the questioning—even if the suspect was in "custody"—was so preliminary as not to be "interrogation," *compare Rhode Island v. Innis,* 446 U.S. 291, 302–03, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (conversation among police officers in suspect's presence concerning impor-

---

1. For example, one eyewitness acknowledged that she had viewed a line-up that included Cruz and had failed to identify him as the shooter.

2. Appellant seeks to avoid the deferential review now required by AEDPA by contending that his claim was not "adjudicated on the merits" by the state courts within the meaning of section 2254(d)(1) because of insufficient state court reference to the federal claim. Whether or not AEDPA deference requires explicit state court reference to the federal claim, *see Washington v. Schriver,* 255 F.3d 45, —— (2d Cir.2001) (amended opinion) (leaving issue unresolved), the state courts sufficiently referred to Cruz's constitu-

tional claim. The Supreme Court explicitly referred to *Miranda* warnings in rejecting Cruz's claim that such warnings were required, and, in affirming, both the Appellate Division, *Cruz,* 233 A.D.2d at 102, 649 N.Y.S.2d at 430, and the Court of Appeals, *Cruz,* 90 N.Y.2d at 962, 665 N.Y.S.2d at 47, 687 N.E.2d 1329, ruled that Cruz's statements were "not the product of custodial interrogation." The Court of Appeals also explicitly ruled that the statements were admissible "despite the lack of *Miranda* warnings." *Id.* The state courts adequately indicated their awareness that Cruz was contending that his statements had been obtained without observance of his Fifth Amendment protections.

tance of locating gun was not "interrogation"), *with Pennsylvania v. Muniz,* 496 U.S. 582, 600, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (asking drunk driving suspect whether he knew the date of his sixth birthday was "interrogation"); *see also New York v. Quarles,* 467 U.S. 649, 664, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (O'Connor, J., concurring in part and dissenting in part) (noting that *Miranda* warnings are required only when there is both "custody" and "interrogation"). Because the questioning of Cruz unquestionably was "interrogation" for purposes of *Miranda,* the state appellate courts' rejection of his *Miranda* claim on the ground that there was no "custodial interrogation" is properly understood to mean that the interrogation was conducted in the absence of "custody."

*Miranda* stated that its requirements apply to "custodial interrogation," which the Court explained was "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. 1602. The Court also noted that the decision was not intended to apply to "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process." *Id.* at 477, 86 S.Ct. 1602. Because most people stopped by police on a street and asked questions would not feel free to leave, these two thoughts created a potential conflict that subsequent decisions have not entirely eliminated. On the one hand, the Court exempted "[g]eneral on-the-scene questioning" from *Miranda* warnings, yet required them whenever a

person is "deprived on his freedom of action in any significant way."

The uncertainty about the need for *Miranda* warnings for those stopped and questioned in a public setting was bound to become more troublesome once the Supreme Court ruled in *Terry v. Ohio,* 392 U.S. 1, 22–23, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that police investigating suspicious behavior could stop, briefly detain, and frisk a person on a street, without having to meet the Fourth Amendment's probable cause requirement. *Terry* acknowledged that the stop and frisk was a "seiz[ure]," *id.* at 19, 88 S.Ct. 1868, but explicitly declined to decide the "propriety of an investigative 'seizure' . . . for purposes of . . . interrogation," *id.* at 19 n. 16, 88 S.Ct. 1868.[3] In *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), however, the Court, in upholding a *Terry* stop of individuals in a car at a border, authorized the immigration officer to "question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances." *Id.* at 881–82, 95 S.Ct. 2574. *Brignoni–Ponce* did not state that *Miranda* warnings were not required, although that was the opinion's implication.

In *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the Court made it clear that *Miranda* warnings are not required simply because "the questioning took place in a 'coercive environment.'" *Id.* at 495, 97 S.Ct. 711. The suspect in *Mathiason* came to a police station voluntarily at the request of the police and was questioned in a closed room. Although the questioning in *Mathiason* did not occur in a public setting, the

---

**3.** Justice White expressed his view that "if the investigative stop is sustainable at all, constitutional rights are not necessarily violated if pertinent questions are asked and the person is restrained briefly in the process." *Terry,* 392 U.S. at 35, 88 S.Ct. 1868 (White, J., concurring).

Court, in ruling *Miranda* warnings unnecessary, echoed the statement in *Miranda* that depriving a person of "freedom of action" is relevant to triggering *Miranda* warnings: "[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or *restraint on freedom of movement,* the questioning took place in a 'coercive environment.'" *Id.* at 495, 97 S.Ct. 711 (emphasis added).[4] That thought was repeated in *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), another case involving police station questioning: in determining "whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* at 1125, 103 S.Ct. 3517 (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711).

While the Court was articulating a "freedom of movement" standard for *Miranda* warnings, it was developing what appeared to be a similar "free to leave" standard for determining when a seizure occurred for purposes of the Fourth Amendment. In *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), Justice Stewart, writing for himself and then–Justice Rehnquist, said that a Fourth Amendment "seizure" occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S.Ct. 1870. Justice Stewart identified circumstances that "might indicate a seizure": "the threatening presence of several police officers, the

display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* The "free to leave" formulation for "seizure" cases was later embraced by a majority opinion of the Court in *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Court finally grappled with the issue of whether *Miranda* warnings are required for a person stopped and questioned in a public setting. *Berkemer* concerned questioning during a traffic stop, a context in which, as the Court acknowledged, the person stopped feels some restraint on "freedom of movement" and does not feel "free to leave": "Certainly few motorists would feel free ... to leave the scene of a traffic stop without being told that they might do so." 468 U.S. at 436, 104 S.Ct. 3138. In ruling that in a typical traffic stop, *Miranda* warnings are not required, the Court reasoned that the circumstances of a traffic stop of brief duration were "analogous to a so-called '*Terry* stop,'" *id.* at 439, 104 S.Ct. 3138, and then stated, "The comparatively nonthreatening character of detentions of this sort [*i.e., Terry* stops] explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda,*" *id.* at 440, 104 S.Ct. 3138. The exemption of typical *Terry* stops from *Miranda* requirements provided the explicit rationale for *Berkemer:* "The similarly [to *Terry* ] non-coercive aspects of ordinary traffic stops prompts us to hold that persons temporari-

---

4. The Court had previously ruled that custody, sufficient to require *Miranda* warnings, was present as to a suspect questioned while in prison, *Mathis v. United States,* 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), and as to a suspect whom the police acknowledged was "under arrest" when questioned at 4 a.m. in his home, *Orozco v. Texas,* 394 U.S. 324, 326–27, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).

ly detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Id.* The Court appeared to acknowledge, however, that a traffic stop of more than brief duration could present circumstances amounting to "custody." *Id.* at 441 n.34, 104 S.Ct. 3138 (citing, with apparent approval, *Commonwealth v. Meyer*, 488 Pa. 297, 301, 307, 412 A.2d 517, 518–19, 522 (1980), which held that a driver detained for more than half an hour was in custody for purposes of *Miranda*).

In the course of using the *Terry* stop analogy to permit questioning at routine traffic stops without *Miranda* warnings, *Berkemer* explicitly acknowledged that a person subjected to a *Terry* stop has been detained. "Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may *detain* that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Id.* at 439, 104 S.Ct. 3138 (quoting *Brignoni–Ponce*, 422 U.S. at 881, 95 S.Ct. 2574) (footnote omitted) (emphasis added). Nevertheless, the Court stated, in language pertinent to the pending appeal, once the stop has been made, "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information *confirming* or dispelling *the officer's suspicions*." *Id.* (emphases added).

*Berkemer* emphasizes that "the only relevant inquiry [in determining when a person is in "custody" for purposes of *Miranda* ] is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442, 104 S.Ct. 3138 (footnote omitted). However, this cryptic reference to the suspect's "situation" left it unclear whether the Court was applying the "freedom of movement" standard from custodial interrogation cases such as *Mathiason* and *Beheler* or the "free to leave" standard from Fourth Amendment seizure cases such as *Mendenhall* and *Delgado*, or whether the two formulations are not meaningfully distinct.

The opinion in *Berkemer* somewhat clarified what was meant by the "situation" by referring to "those types of situations in which the concerns that powered [*Miranda*] are implicated." *Id.* at 437, 104 S.Ct. 3138. "Thus we must decide whether a traffic stop exerts upon a detained person *pressures* that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id.* (emphasis added). One key circumstance, identified by the Court, is whether the detention is reasonably perceived as brief. "A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way." *Id.* (footnote omitted). The Court distinguished the typical traffic stop from "stationhouse interrogation, which frequently is prolonged." *Id.* at 438, 104 S.Ct. 3138.

Another pertinent circumstance, the Court noted, is the public nature of the scene. "This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." *Berkemer*, 468 U.S. at 438, 104 S.Ct. 3138. A third circumstance is the number of officers, typically one or two at a traffic stop. *See id.* Significantly, the Court explicitly analogized these circum-

stances—likely short duration, public scene, and few officers—to a typical *Terry* stop, at which, in the absence of added circumstances amounting to "custody," *Miranda* warnings are not required. *Id.* at 439–40, 104 S.Ct. 3138.

Since *Berkemer*, the Court has not explicitly considered what circumstances of a *Terry* stop would constitute "custody" requiring *Miranda* warnings, but it has continued to face the similar, and perhaps identical, inquiry as to whether the circumstances of a stop resulted in a Fourth Amendment "seizure" that permits a search incident to an arrest.[5] In *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), the Court applied the "free to leave" standard in ruling that a seizure had *not* occurred where police officers in a patrol car noticed a man start to run after observing their vehicle, and drove their vehicle alongside him for a short distance. "While the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure." *Id.* at 575, 108 S.Ct. 1975 (footnote omitted). *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), also involving police pursuit that was held not to constitute a seizure, added an important qualification to the "free to leave" formulation. That standard, the Court noted, "states a *necessary*, but not a *sufficient*, condition for seizure—or, more precisely, for seizure effected through a 'show of authority.'" *Id.* at 628, 111 S.Ct. 1547 (emphases in original).

The status of the "free to leave" standard was rendered somewhat unclear by the Court's opinion in *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). In a Fourth Amendment case, the Court deemed the "free to leave" analysis inapplicable to a person questioned by police officers on a bus about to depart on an interstate trip. *Id.* at 436, 111 S.Ct. 2382. Because it was literally fear of "missing the bus" and not the police presence that caused the passenger to feel not free to leave, the Court said that in such a situation "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests [to see the passengers's ticket and identification] or otherwise terminate the encounter." *Id.* However, the Court also stated that its "free to decline" formulation "applies equally to police encounters that take place on trains, planes, *and city streets*." *Id.* at 438, 111 S.Ct. 2382 (emphasis added). The emphasized words, coming after the observation in *Hodari D.* that feeling not "free to leave" is a necessary but not a sufficient condition of a seizure, imply that a person stopped for sidewalk questioning is not in custody for purposes of *Miranda* warnings simply because the person reasonably feels not free to leave. That also seems to have been the message of *Berkemer*, because the Court there acknowledged that the motorist did not feel free to leave, yet could be questioned without *Miranda* warnings.

Courts endeavoring to determine from this evolution of Supreme Court jurisprudence under what circumstances sidewalk questioning of a suspect not under arrest requires *Miranda* warnings face an understandably daunting task. The Supreme Court itself has acknowledged the difficulty of determining "custody" for purposes of *Miranda*. *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222

---

**5.** *Terry* had authorized a pat-down (frisk) for weapons in non-"seizure" cases. 392 U.S. at 29, 88 S.Ct. 1868.

(1985) ("[T]he task of defining 'custody' is a slippery one. . . .").

Although our inquiry under AEDPA is to determine whether the state courts reasonably applied clearly established Supreme Court law, we think it appropriate to make some examination of how the federal courts of appeals have analyzed the issue of custody for *Miranda* purposes. We make this inquiry, not to determine whether all reasonable jurists could deem the circumstances of Cruz's questioning to involve "custody," *see Terry Williams v. Taylor*, 529 U.S. 362, 377–78, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (rejecting "all reasonable jurists" standard for determining reasonableness of state court adjudication), but to see the considerations that these courts have considered relevant. The Fourth Circuit has said that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes." *United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir.1995). The Sixth Circuit has said that a " 'free to leave' inquiry is at least a component of a Fifth Amendment custody determination," but then added "(presumably with the exception of a *Terry* stop situation)." *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir.1998). *Salvo* endeavors to harmonize this *Terry* "exception" with the "free to leave" inquiry by saying that the latter inquiry "becomes more pertinent" in "non-transitory, more protracted interrogation situations." *Id.* at 949. The Ninth Circuit has stated that what matters is "whether a reasonable innocent person in such circumstances would conclude that *after brief questioning* he or she would not be free to leave." *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981) (emphasis added).

The cases in our Circuit seem not entirely consistent. We have rejected custody as to a suspect questioned at an airport, *United States v. Waltzer*, 682 F.2d 370, 373–74 (2d Cir.1982), and as to a suspect taken out of her apartment during a search and questioned elsewhere in the building, *United States v. Kirsh*, 54 F.3d 1062, 1067–68 (2d Cir.1995). We also found no custody as to a person who was told to get out of her car at gunpoint and then briefly handcuffed. *United States v. Cota*, 953 F.2d 753, 758–59 (2d Cir.1992). However, in *United States v. Ali*, 86 F.3d 275, 276 (2d Cir.1996), we found custody for an airport interrogation where there were seven officers, a display of handguns, and the removal of the suspect's papers. We also found custody in *United States v. Moody*, 649 F.2d 124, 128 (2d Cir.1981), as to a suspect taken to a private room at an airport for questioning.

We have recognized that a *Terry* stop "may turn into custodial detention," *United States v. Ali*, 68 F.3d 1468, 1473 (2d Cir.1996), but we seem to have placed considerable weight on whether the suspect feels "free to leave," *id.*, without acknowledging that in all *Terry* stops (and traffic stops), the suspect does not feel free to leave, at least not while the permitted (brief) questioning is occurring. On the other hand, we have also said that custody itself does not necessarily require *Miranda* warnings: "Only questioning that reflects a measure of compulsion above and beyond that inherent in custody itself constitutes interrogation the fruits of which may be received in evidence only after *Miranda* warnings have been given." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir.1987).

The difficulty of determining "custody" for purposes of *Miranda, see Elstad*, 470 U.S. at 309, 105 S.Ct. 1285, and the Supreme Court's lack of clear guidance

on the issue in the context of sidewalk questioning suggest that, unless the facts clearly establish custody, a state court should be deemed to have made a reasonable application of clearly established Supreme Court law in concluding that custody for *Miranda* purposes was not shown. In the pending case, some of the circumstances admittedly point toward custody. There were several officers and they had guns drawn. They ordered the suspect not to move and to put his hands up. They frisked him and, in his presence, radioed for other officers to bring an eyewitness to identify him. But several circumstances point the other way. They reholstered their guns as soon as they ascertained that the suspect was not armed. The questioning occurred on a public street. The suspect was not handcuffed. The statements sought to be suppressed were made after very brief questioning of the sort that could reasonably be thought not to make the suspect feel that he was about to be held for a prolonged period of time.

*Terry* recognized "the need for law enforcement officers to protect themselves ... in situations where they may lack probable cause for an arrest," 392 U.S. at 24, 88 S.Ct. 1868, and some of the circumstances of stopping Cruz reflect the officers' initial concern for their safety, *e.g.,* displaying guns, ordering Cruz to put his hands up, and then frisking him. Once the officers ascertained that he was not armed, they put their guns away. Several courts have ruled that an initial display of guns, subsequently reholstered, does not result in "custody" that requires *Miranda* warnings. *See United States v. Jones,* 21 F.3d 165, 170 (7th Cir.1994); *United States v. Gregory,* 891 F.2d 732, 735 (9th Cir.1989); *United States v. Manbeck,* 744 F.2d 360, 372, 378–80 (4th Cir.1984). The only other fact tending to create a coercive environment is that the officers, in the presence of

Cruz, radioed for a witness to come and identify him. Although that surely made Cruz apprehensive, it was well within the Supreme Court's scope of permissible *Terry*-stop action "confirming or dispelling the officer's suspicions." *Berkemer,* 468 U.S. at 439, 104 S.Ct. 3138.

Whether or not we would find custody on a *de novo* inquiry, we do not think the New York courts *unreasonably* applied clearly established Supreme Court law in concluding that Cruz was not in custody for purposes of *Miranda.* It is true that the state trial court incorrectly relied on the interrogating officer's subjective state of mind, *see Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (only "objective circumstances of the interrogation" are relevant to "custody" issue), but we are determining the reasonableness of the state courts' "decision," 28 U.S.C. § 2254(d)(1), not grading their papers. Several circuits have noted that, in making the "reasonable application" determination, they would look to the result of a state court's consideration of a criminal defendant's claim, *e.g., Neal v. Puckett,* 239 F.3d 683, 695–96 (5th Cir. 2001); *Long v. Humphrey,* 184 F.3d 758, 760–61 (8th Cir.1999); *Matteo v. Superintendent,* 171 F.3d 877, 891 (3d Cir.1999) (in banc); *Hennon v. Cooper,* 109 F.3d 330, 334–35 (7th Cir.1997). Although sound reasoning will enhance the likelihood that a state court's ruling will be determined to be a "reasonable application" of Supreme Court law, *Hennon,* 109 F.3d at 335, deficient reasoning will not preclude AEDPA deference, *see Neal,* 239 F.3d at 696; *Hennon,* 109 F.3d at 335, at least in the absence of an analysis so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated. In this case, we are satisfied that the state courts have not made an unreasonable application of clearly established Supreme Court law

in concluding that Cruz was not subjected to custodial interrogation.

Conclusion

The judgment of the District Court denying a writ of habeas corpus is affirmed.