Wesley, Circuit Judge,
dissenting:
Today, the majority holds that a young woman’s struggle with a minor depressive disorder is so obviously damaging to her credibility in the prosecution of her alleged rapist that there is no room for fairminded disagreement. The majority reaches this conclusion by speculating about the victim’s emotional state based on symptoms nowhere present in the record; instead, the majority extrapolates them from a medical text’s general description of symptoms that may be — but are not always — present in people who suffer from the same disorder. The majority’s opinion misapplies Supreme Court precedent and creates facts for its AEDPA analysis where none exist in the record. I therefore dissent.
“The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.” Harris v. Nelson, 394 U.S. 286, 290-91, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969). Yet it also “intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority.” Harrington v. Richter, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). Accordingly, in an effort to protect both individual liberty and federalism, a federal court may grant a writ of habeas corpus in disagreement with a state court’s decision only if that decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States” or “was based on an unreasonable determination of the facts.” 28 U.S.C. § 2254(d). In order to hold that a state court’s decision was an “unreasonable application” of federal law, a federal court must conclude “that there was no reasonable basis for the state court to deny relief,” Harrington, 562 U.S. at 98, 131 S.Ct. 770, and that “there [was] no possibility fairminded jurists could disagree that the state court’s decision conflicts with [the Supreme] Court’s precedents,” id. at 102, *254 131 S.Ct. 770. When considering the consistency of the state court decision with Supreme , Court precedent, “[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.” Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).
Accordingly, in reviewing Fuentes’s petition for habeas relief under a Brady claim, we grant the state court “a deference and latitude that are not in operation when the case involves review under the [Brady] standard itself.” Harrington, 562 U.S. at 101, 131 S.Ct. 770. Critically, our review must defer to the decision, i. e., the substantive conclusion, reached by the state court — not the reasoning it employed to reach that decision. Our Circuit adopted this position in 2001, stating candidly, “[W]e are determining the reasonableness of the state courts’ ‘decision,’ not grading their papers.” Cruz v. Miller, 255 F.3d 77, 86 (2d Cir. 2001) (citation omitted) (quoting 28 U.S.C. § 2254(d)(1)); accord Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003); see also Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (“Nowhere does [§ 2254(d)] make reference to the state court’s process of reasoning.”). The Supreme Court has reinforced this approach in two cases applying deferential review to state court decisions entirely lacking any explanation of their reasoning. See Johnson v. Williams, — U.S. -, 133 S.Ct. 1088, 1094, 185 L.Ed.2d 105 (2013); Harrington, 562 U.S. at 96-97, 131 S.Ct. 770. Further, in Premo v. Moore, decided on the same day as Harrington, the Court framed habeas review of a state court’s Strickland analysis not as whether the state court had properly conducted the analysis but “whether there [was] any reasonable argument that counsel satisfied Strickland’s deferential standard.” 562 U.S. 115, 123, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011) (emphasis added).[1] Likewise, our sister circuits have overwhelmingly interpreted § 2254 to require deference to the state court’s result, not to the presence or the particulars of its reasoning. See, e.g., Holland v. Rivard, 800 F.3d 224, 236-37 (6th Cir. 2015); Makiel v. Butler, 782 F.3d 882, 906 (7th Cir. 2015); Williams v. Roper, 695 F.3d 825, 831-32 (8th Cir. 2012); Gill v. Mecusker, 633 F.3d 1272, 1291-92 (11th Cir. 2011); Clements v. Clarke, 592 F.3d 45, 55 (1st Cir. 2010); Hernandez v. Small, 282 F.3d 1132, 1140 (9th Cir. 2002); Neal v. Puckett, 239 F.3d 683, 696 (5th Cir. 2001); Bell v. Jarvis, 236 F.3d 149, 159 (4th Cir. 2000) (en banc); Aycox v. Lytle, 196 F.3d 1174, 1177-78 (10th Cir. 1999).[2]
As the majority acknowledges, the availability of writs of habeas corpus in federal court “is a guard against extreme malfunctions in the state criminal justice systems, *255 not a substitute for ordinary error correction through appeal.” Harrington, 562 U.S. at 102-03, 131 S.Ct. 770 (internal quotation marks omitted). Therefore, to obtain habe-as relief,
a state prisoner must show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.
Id. at 103, 131 S.Ct. 770. This standard is “difficult to meet ... because it was meant to be”; it is grounded in respect for the State’s sovereignty, its “good-faith attempts to honor constitutional rights,” and its “significant interest in repose for concluded litigation.” Id. at 102-03, 131 S.Ct. 770 (internal quotation marks omitted); accord Burt v. Titlow, — U.S. -, 134 S.Ct. 10, 16, 187 L.Ed.2d 348 (2013) (“We will not lightly conclude that a State’s criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy.” (alteration and internal quotation marks omitted)). As our Court has explained in the past, “we cannot grant habeas relief where a petitioner’s claim pursuant to applicable federal law, or the U.S. Constitution, has been adjudicated on its merits in state court proceedings in a manner that is not manifestly contrary to common sense.” Anderson v. Miller, 346 F.3d 315, 324 (2d Cir. 2003).
The majority bases its decision in this case on what it identifies as errors in the New York State Court of Appeals majority’s reasoning, including misreading of the record of consultation (“ROC”), improperly weighing the trial evidence, and failing to consider the “uniquely important nature of the ROC in these circumstances.” Majority Op., ante, at 253. But, as discussed above, we are to determine whether there is “any reasonable argument” that the ROC was not material under the Brady standard, Premo, 562 U.S. at 123, 131 S.Ct. 733, not parse the state court opinion for “deficient reasoning,” Cruz, 255 F.3d at 86. In other words, we must conclude not only that the suppression of the ROC creates a “‘reasonable probability’ of a different result” and “undermines confidence in the outcome of the trial,” Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)), but that a contrary conclusion would be “so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington, 562 U.S. at 103, 131 S.Ct. 770 (emphasis added).
The majority attempts to vault over this high barrier on the assertion that G.C.’s psychiatric report is unquestionably material to her motives and credibility — an assertion premised exclusively on the thin straw of two words contained in the ROC: “Dysthymic Disorder,” App. 536. By way of overview, dysthymic disorder is “a chronically depressed mood,” accompanied by “at least two of the following additional symptoms”: “poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness.” DSM-IV, at 345. In other words, a chronically depressed mood is the only symptom that exists in every diagnosis of dysthymic disorder; to make a diagnosis, a doctor must conclude that two (or more) of the other listed symptoms are present, but the specific two may vary among individual cases. Importantly, therefore, the existence of a diagnosis alone does not indicate which of the possible additional symptoms are present.
*256 Furthermore, although “chronic” carries a connotation of severity in common parlance, in the context of dysthymic disorder, it simply means “present for more days than not over a period of at least 2 years.” DSM-IV, at 343; see also Persistent Depressive Disorder (Dysthymia), The Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/ home/ove-20166590 (last visited July 11, 2016) (characterizing dysthymia as “a continuous long-term (chronic) form of depression”). Dysthymic disorder is considered “less severe” than “Major Depressive Disorder,” which involves episodes of at least two weeks in which the depressive mood is “present for most of the day, nearly every day.” DSM-IV, at 343. The DSM-IV estimates that, at any given time, three percent of the population suffers from dysthymia, and another three percent has suffered from it in the past. See id. at 347.
The majority’s analysis takes the general description of this disorder and runs with it. Without any evidence that G.C. actually experienced any such symptoms, the majority ominously warns that dys-thymic disorder “may” also be accompanied by “feelings of inadequacy,” “excessive anger,” “interpersonal problems,” or “distorted self-perception.” Majority Op., ante, at 249 (internal quotation marks omitted). It then converts generally associated features that “may be” present in people who suffer from this disorder into a conclusion that “G.C. suffered from a chronic disorder characterized by low self-esteem, feelings of inadequacy, and excessive anger.” Id. at 252 (emphasis added). This analytical leap is simply untenable: these symptoms are not part of the “Diagnostic Features” of the disorder, DSM-IV, at 345-46, but instead are part of the DSM-IVs “Associated Features” category, id. at 346-47, which is a category describing “clinical features that are frequently associated with the disorder but that are not considered essential to making the diagnosis,” id. at 256. In other words, the fact that these symptoms may appear in individuals with the disorder cannot be extrapolated as characteristics of the disorder for every individual suffering from dysthymic disorder.[3] No aspect of the record here indicates that the doctor diagnosed G.C. with these specific associated features; while the ROC mentions that G.C. experienced difficulty with her mother, frequently cried, and was angry at herself “because she went home late and put herself at risk,” J.A. 536 (internal quotation marks omitted), these statements are hardly diagnoses of “excessive” anger or systemic “interpersonal problems.”
The majority then says, incredibly, that this generic description of the possible associated features of a minor depressive disorder — a disorder that between roughly 4.5 and 9.5 million people will experience this year[4] — “potentially corroborated Fuentes’s account of her behavior as ‘unstable’ and ‘erratic’ when he declined to see her again, to wit, being angry and volubly upset at being rejected.” Majority Op., ante, at 249 (emphasis added). First, there is simply no connection between the symptoms actually diagnosed in the ROC and this conclusion. Second, potentially corroborating Fuentes’s account is not enough. To grant habeas relief, the majori *257 ty has to conclude not only that the suppression of this record “undermines confidence” in the verdict, Kyles, 514 U.S. at 434, 115 S.Ct. 1555 (internal quotation marks omitted), but also that it does so to such an overwhelming level of objective certainty that no fairminded jurist could disagree, see Harrington, 562 U.S. at 102, 131 S.Ct. 770.
Some psychiatric history evidence unquestionably will be so material to witness or victim credibility that the only objectively reasonable conclusion is that its suppression violates Brady. This evidence, however, is not in that category. Cases in which courts have held mental health histories so clearly material under Brady that habeas relief is warranted — including all the ones on which Fuentes relies — uniformly show a significantly higher severity of diagnosis and a significantly stronger nexus between the nature of the disorder and its effect on the particular witness’s credibility. In Browning v. Trammell, for example, the psychiatric report described “a severe mental disorder” that made the prosecution’s “indispensable witness” “hostile, assaultive, combative, and even potentially homicidal” with a tendency to “blur reality and fantasy and project blame onto others.” 717 F.3d 1092, 1106 (10th Cir. 2013); see also Gonzalez v. Wong, 667 F.3d 965, 982-84 (9th Cir. 2011) (holding psychiatric reports to be material where they detailed a history of deceitful and manipulative behavior by a witness as well as symptoms of schizophrenia, implicating his “competency to perceive accurately and testify truthfully”). The Third Circuit found a mental health evaluation of an eyewitness showing blackouts, dissociative tendencies, poor judgment, and distorted perceptions of reality to constitute material impeachment evidence. See Wilson v. Beard, 589 F.3d 651, 665-66 (3d Cir. 2009); cf. United States v. Pryce, 938 F.2d 1343, 1346 (D.C. Cir. 1991) (reversing conviction based on failure to permit cross-examination of an eyewitness on the basis of recent hallucinations). The Ninth Circuit held that the withholding of expert reports on a developmentally disabled victim’s ability to understand consent was sufficiently material to warrant habeas relief. See Bailey v. Rae, 339 F.3d 1107, 1114-15 (9th Cir. 2003). Into the company of mental health characteristics that are clearly and expressly tied to a critical component of witness credibility, the majority adds “a chronically depressed mood that occurs for most of the day more days than not for at least 2 years.” DSM-IV, at 345. One of these things is not like the others.
Despite Fuentes’s arguments to the contrary, this ease is not analogous to a single-eyewitness case containing a withheld witness statement that the witness “ ‘would not know [the perpetrators] if [he] saw them,’ ” directly contradicting the witness’s statement on the stand that he had “[n]o doubt” about the defendant’s identity, Smith v. Cain, — U.S. -, 132 S.Ct. 627, 629-30, 181 L.Ed.2d 571 (2012) (second and third alterations in original) (internal quotation marks omitted). Here, each side presented one corroborating witness: the prosecution presented Tammy Little, who testified that Fuentes had not met G.C. at the arcade as he claimed, and the defense presented a private investigator, who testified that G.C. had told him that the sexual activity was consensual. Though the majority recounts at length ways in which G.C.’s version of events could be attacked, see Majority Op., ante, at 249-53, these facts were all known to the jury as a basis for contesting G.C.’s testimony. Nothing in the ROC contradicted her testimony, nor did it provide non-speculative evidence that G.C.’s mental state included a propensity to react in an emotionally disturbed or vindictive manner *258 to a one-night stand’s refusal to see her again.[5]
Instead, both Fuentes and the majority rely on rampant speculation about symptoms not diagnosed in the psychiatric report in order to claim its materiality. None of the suppositions made about G.C. — that she would become irrational after rejection or that whatever emotional reaction she had would manifest in a false accusation of rape — is supported by the record that was before the state court. See Cullen v. Pinholster, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (“[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.”). Although Fuentes appeals to the potential for further investigation by defense counsel, as did the state court dissenters, the record provides no basis to think that further investigation would — as opposed to might — have uncovered actual symptoms in G.C. supporting Fuentes’s characterization of her as emotionally volatile or manipulative. See Wood v. Bartholomew, 516 U.S. 1, 6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (per curiam) (reversing Ninth Circuit’s grant of habeas relief on Brady grounds “based on mere speculation” that suppressed polygraph results “might have led respondent’s counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized”).[6] A speculative appeal to possible symptoms — which the excluded document gives us no reason to believe G.C. experienced — is simply not a basis on which to hold a state court’s decision “so lacking in justifícation that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.” Harrington, 562 U.S. at 103, 131 S.Ct. 770.
The majority opinion identifies no Supreme Court precedent that squarely addresses psychiatric reports in the Brady context, such that finding no materiality here can be truly be called “an unreasonable application of[] clearly established federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1); see also Smith v. Wenderlich, No. 14-3920, 826 F.3d 641, 648-50, 2016 WL 3457618, at *6 (2d Cir. June 24, 2016) (Kearse, /.) (“When there is no Supreme Court holding on a given issue, ‘it cannot be said that the state court unreasonably] appli[ed] clearly established Federal law1 within the meaning of AEDPA.” (alterations in original) (quoting Carey v. Musladin, 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006))). Its only attempt is to cite Williams [Michael] v. Taylor, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000), a case in which the Court decided the petitioner could not receive an eviden-tiary hearing on, inter alia, his claims of suppression of a psychiatric report. Williams [Michael], however, did not examine the materiality of a psychiatric report; rather, it concerned whether the petitioner had developed the factual basis for his arguments in state court under § 2254(e)(2). See id. at 440, 120 S.Ct. 1479. It is well established in federal habeas law that we must consider only the holdings, *259 not the dicta, of Supreme Court cases. See, e.g., Musladin, 549 U.S. at 74, 127 S.Ct. 649 (citing Williams [Terry] v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Concluding that Williams [Michael] implies the Brady materiality of all psychiatric reports is not applying clearly established federal law. Even if the case were about materiality, however, the psychiatric report in Williams [Michael] showed severe mental health conditions, possessed by the specific witness and with an indisputable impact on his credibility: the report detailed the main cooperating eyewitness’s, “little recollection of the [murders], other than vague memories, as he was intoxicated with alcohol and marijuana at the time” and also detailed his post-traumatic stress disorder, major depression, and overwhelming guilt and shame for his participation in the murders. Williams [Michael], 529 U.S. at 438-39, 120 S.Ct. 1479 (internal quotation marks omitted). Like the examples from other circuits cited above, there can be no reasonable disagreement that such information about a key eyewitness seriously calls into question the credibility of his testimony. The same cannot be said for the ROC, which itself contains no information tending to impeach G.C.’s testimony or to portray her as emotionally volatile or vindictive. Williams [Michael] simply does not create a clearly established rule on the materiality of psychiatric reports and especially not of those that do not facially impeach witness testimony.
The majority has, in essence, grounded its decision on concerns with what it views to be analytical errors in the Court of Appeals’ opinion. But even a clearly erroneous decision does not satisfy the standard for granting the writ. See Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). While focusing on whether or not the Court of Appeals accurately analyzed the record, the majority has “all but ignored the only question that matters under § 2254(d)(1)” — namely, “whether it is possible fairminded jurists could disagree that [the state court’s decision] [is] inconsistent with the holding in a prior decision of th[e] [Supreme] Court.” Harrington, 562 U.S. at 102, 131 S.Ct. 770 (internal quotation ’marks omitted). As a result, the majority has committed the same error for which the Supreme Court criticized the Ninth Circuit in Harrington:
The Court of Appeals appears to have treated the unreasonableness question as a test of its confidence in the result it would reach under de novo review: Because the Court of Appeals had little doubt that [the petitioner’s] claim had merit, the Court of Appeals concluded the state court must have been unreasonable in rejecting it. This analysis overlooks arguments that would otherwise justify the state court’s result and ignores further limitations of § 2254(d), including its requirement that the state court’s decision be evaluated according to the precedents of this Court. It bears repeating that even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable.
Id. (emphasis added) (citations omitted). Given that there is no specific holding from the Supreme Court on psychiatric records under Brady, we are left with the highly general Kyles standard, which by necessity creates “more leeway ... in reaching outcomes in case-by-case determinations.” Yarborough, 541 U.S. at 664, 124 S.Ct. 2140. A decision that the ROC does not create a reasonable probability of a different verdict is simply not outside of that leeway. ■
Perhaps it is the prosecutor’s intentional decision to exclude the ROC from a purported open-file discovery without disclosing that fact to the defendant or to the *260 court that draws the majority’s ire. It is certainly inexcusable for a prosecutor to represent that everything has been produced when it has not — and even more inexcusable to answer a direct question by the court by detailing G.C.’s various physical examinations in the hospital but omitting the psychological evaluation. See J.A. 177-78.[7] But — for better or for worse — the Supreme Court has told us that no greater remedy is available under Brady for a prosecutor’s intentional violation of constitutional standards than for an inadvertent one. See Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Thus, we are bound to the narrow questions of whether the evidence was favorable, suppressed, and material. See Poventud v. City of New York, 750 F.3d 121, 133 (2d Cir. 2014) (en banc). In no universe does a conclusion that this one-page, minimally probative document is not prejudicial under Brady constitute an “extreme malfunction ] in the state criminal justice system[]”; instead, the majority has engaged in “ordinary error correction” of the kind we are forbidden by Congress to undertake. Harrington, 562 U.S. at 102, 131 S.Ct. 770 (internal quotation marks omitted). And in making just such an error correction, the majority’s dissatisfaction with the prosecutor’s conduct and the state courts’ treatment of the record has led to its misapplication of § 2254(d)(1) and Supreme Court precedent framing the deferential nature of our habeas review.
Accordingly, I dissent.

. Judge Posner has aptly explained the flaws of a reasoning-focused review:
[It] would place the federal court in just the kind of tutelary relation to the state courts that the [AEDPA] amendments are designed to end.... A federal court in a habeas corpus proceeding cannot remand the case to the state appellate court for a clarification of that court’s opinion; all it can do is order a new trial, though the defendant may have been the victim not of any constitutional error but merely of a failure of judicial articulateness.
Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997).

. It bears repeating that, even of the diagnostic symptoms, only a chronically depressed mood is present in all cases of the disorder and therefore is the only symptom that can be logically extrapolated from the fact of diagnosis alone.

. See DSM-IV, at 347; Dysthymic Disorder Among Adults, National Institute for Mental Health, http://www.nimh.nih.gov/health/ statistics/prevalence/dysthymic-disorder-among-adults.shtml (last visited July 11, 2016).

. Fuentes’s argument that the ROC's reference .to frequent crying could have been used to portray G.C.’s tears on the stand as unrelated to her retelling an account of sexual assault, see Majority Op., ante, at 243, strikes me as far-fetched.

. Not until his federal habeas proceeding did Fuentes provide a report by a psychiatric expert — though not the one who examined G.C. in the hospital — suggesting what further investigation might have revealed. Fuentes wisely does not rely on this report on appeal because, in addition to its speculative content, Cullen limits our review to the record before the state court, see 563 U.S. at 181, 131 S.Ct. 1388.

. Indeed, such conduct could certainly form the basis of professional discipline for ethical violations. See 22 N.Y.C.R.R. § 1200, Rule 3.3(a) ("A lawyer shall not knowingly ... make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer .... ”); id. Rule 3.4(a)(1) ("A lawyer shall not ... suppress any evidence that the lawyer or the client has a legal obligation to reveal or produce .... ”); id. Rule 3.8(b) ("A prosecutor ... shall make timely disclosure ... of the existence of evidence or information known to the prosecutor ... that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the sentence, except when relieved of this responsibility by a protective order of a tribunal.”); id. Rule 4.1 (''[A] lawyer shall not knowingly make a false statement of fact or law to a third person.”). Accordingly, I have directed the Clerk of the Court to forward copies of the majority opinion and this dissent to the Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts in the Second Department in order that they may consider whether the prosecutor in this case breached her ethical obligations in a manner warranting professional discipline.