*McCray v. Capra*

# United States Court of Appeals
# For the Second Circuit

August Term 2020

Argued: September 16, 2020
Decided: August 17, 2022

No. 18-2336

TERENCE SANDY MCCRAY,

*Petitioner-Appellant*,

*v.*

MICHAEL CAPRA, Superintendent, Sing Sing Correctional Facility,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Northern District of New York
No. 15-cv-1129, James K. Singleton, Jr., *Judge*.

Before:     JACOBS, LYNCH, AND SULLIVAN, *Circuit Judges*.

Terrence Sandy McCray appeals from a judgment of the United States
District Court for the Northern District of New York (Singleton, *J.*) denying his
petition for a writ of habeas corpus under 28 U.S.C. § 2254, following his conviction
in New York state court for first-degree rape. McCray argues principally that the
state trial court violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and

the Sixth Amendment's Confrontation Clause by denying him full access to the victim-witness's mental health records. Because we conclude that the New York Court of Appeals's application of *Brady* and its progeny was not unreasonable and that there is no binding Supreme Court precedent stating that a defendant's right to confrontation extends to pretrial discovery, we **AFFIRM** the district court's judgment denying McCray's petition.

Judge Jacobs dissents in a separate opinion.

AFFIRMED.

> JONATHAN I. EDELSTEIN, Edelstein & Grossman, New York, NY, *for Petitioner-Appellant*.
>
> PRISCILLA STEWARD, Assistant Attorney General (Barbara D. Underwood, Solicitor General, and Nikki Kowalski, Deputy Solicitor General for Criminal Matters, *on the brief*), *for* Letitia James, Attorney General of the State of New York, New York, NY, *for Respondent-Appellee*.

RICHARD J. SULLIVAN, *Circuit Judge*:

Petitioner Terrence Sandy McCray appeals from a judgment of the United States District Court for the Northern District of New York (Singleton, *J.*) denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254, following his conviction in New York state court for first-degree rape. The underlying criminal

case was ultimately a credibility contest. According to the victim,[1] she was violently raped by McCray. According to McCray, he and the victim had consensual sex, the victim subsequently demanded money from him, he refused, she tried to steal his pants and his cash, a brief struggle ensued, and the victim left. The physical evidence – including photos of the victim's bruised face and the bite marks on McCray's arm – was consistent with both stories. Before trial, the prosecution informed McCray that the victim had a history of mental illness, which prompted McCray to request all of her mental health records. The trial court conducted an in camera review of the victim's full mental health records, which totaled more than 5,000 pages, and disclosed to McCray a twenty-eight-page sample that it deemed representative. At trial, the prosecution elicited testimony from the victim regarding her mental health, and the defense vigorously cross-examined her on that subject. The jury returned a guilty verdict.

On direct appeal in the New York state courts, McCray challenged the decision to provide him with only a sample of the victim's mental health records, arguing that doing so violated his right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963), and his right to confront his accuser under the Sixth

---

[1] Although the victim testified in open court, due to the nature of the crime against her and the content of the disputed records, we refrain from using her name in this opinion.

3

Amendment's Confrontation Clause. The New York Court of Appeals ultimately affirmed McCray's conviction, holding that the trial court did not err by providing a sample of the victim's mental health records and finding that the sample was sufficiently representative of the records as a whole. McCray subsequently petitioned for relief under 28 U.S.C. § 2254, which the district court denied.

We must decide whether the New York Court of Appeals unreasonably applied clearly established federal law as determined by the Supreme Court of the United States. We conclude that it did not. Because the New York Court of Appeals's application of *Brady* and its progeny was reasonable and there is no binding Supreme Court precedent providing that a defendant's right to confrontation extends to pretrial discovery in a criminal case, we **AFFIRM** the district court's denial of McCray's petition.

## I. BACKGROUND

Both the victim and McCray testified that they met in 2009 and went on a date in Albany, New York. After an evening of exploring Albany, McCray led the victim to the home of one of his friends, who let the couple in and then immediately retired to his bedroom. Alone on the living room couch, McCray and the victim started kissing. The victim testified that McCray wanted to have sex

after about fifteen minutes, but she refused, telling McCray that it was too early in their relationship. When McCray pressed the point, the victim got angry with him and stormed out of the apartment. McCray chased her down on the street outside to apologize. The victim eventually accepted McCray's apology and proceeded to walk around Albany with him until about midnight. According to the victim, McCray then led her to an abandoned house, where he violently raped her.

After she left the abandoned house, the victim – then weeping and struggling to speak – called 911 from a nearby payphone. She told the operator that McCray had beaten her, made her beg for her life, and raped her. A police officer approached the victim while she was on the phone and saw blood on her clothes and face. Photographs taken later that morning and hospital records show that the victim had abrasions and bruises on her left arm and left cheek, as well as lacerations on the inside of her mouth. A DNA test on samples of semen recovered from the victim's vagina and breasts matched McCray's DNA.

A week later, an Albany County grand jury indicted McCray on the charge of first-degree rape. Before trial, the prosecution provided the defense with a synopsis of the victim's mental health history, including information about her hospitalizations; her diagnoses of bipolar disorder, epilepsy, Tourette's syndrome,

attention deficit disorder, and post-traumatic stress disorder ("PTSD"); and her histories of hypersexuality and auditory and visual hallucinations. The prosecution also disclosed the victim's allegations that she had been the victim of three prior sexual-abuse incidents. Following these disclosures, McCray sought all of the victim's mental health records relating to her testimonial capacity, memory, and/or credibility. The trial court directed that the records be submitted in camera so that it could review the records and determine which were material and needed to be disclosed to the defense. After reviewing more than 5,000 pages of the victim's mental health records, the trial court provided the defense with a twenty-eight-page sample it deemed representative of the relevant corpus of documents. On direct examination, the victim told the jury about her mental health diagnoses and the medications she took at the time of the incident. She was also cross-examined at length by defense counsel about her mental health status and treatment.

Following the prosecution's case, McCray elected to testify in his own defense. During that testimony, McCray disputed key portions of the victim's testimony and stated unequivocally that the sexual encounter was completely consensual. The jury ultimately returned a verdict finding McCray guilty of

6

first-degree rape. He was subsequently sentenced to twenty-two years' imprisonment.

McCray appealed to the Appellate Division, Third Department, which affirmed his conviction. *See People v. McCray* (*McCray I*), 958 N.Y.S.2d 511, 514 (3d Dep't 2013). He then appealed to the New York Court of Appeals, which also affirmed. *See People v. McCray* (*McCray II*), 23 N.Y.3d 193, 196 (2014). One of McCray's key arguments on direct appeal was that the trial court violated his confrontation and due process rights by refusing to provide him with the victim's full mental health records. The New York courts rejected this argument.

In 2015, McCray petitioned pro se for a writ of habeas corpus under 28 U.S.C. § 2254 in the Northern District of New York. The district court denied the petition, finding that the New York Court of Appeals's conclusion that the withheld documents were not material was not "unreasonable or contrary to *Brady* or its progeny." *McCray v. Capra* (*McCray III*), No. 15-cv-1129 (JKS), 2018 WL 3559077, at \*11 (N.D.N.Y. July 24, 2018). The district court nonetheless granted a certificate of appealability on the sole question of whether the nondisclosure of the victim's mental health records violated *Brady*. McCray filed a counseled motion to expand the certificate of appealability to include the question of whether

the nondisclosure of the victim's mental health records also violated his Sixth Amendment right to confrontation, which this Court granted.

## II.   STANDARD OF REVIEW

We review the denial of a section 2254 petition de novo.  *Scrimo v. Lee*, 935 F.3d 103, 111 (2d Cir. 2019).  A federal court may not grant a writ of habeas corpus pursuant to section 2254 unless (1) the state court's decision was "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States," or (2) the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011).  On a habeas petition under section 2254, we review the "last reasoned decision" by the state court, *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991), only for the "reasonableness" of its bottom-line "result," not the "quality of [its] reasoning," *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (citation omitted).  Thus, we extend considerable "deference" even to "deficient reasoning . . . , at least in the absence of an analysis so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated."  *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) (internal citations

omitted). Put differently, our review under section 2254 is not "a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102–03 (citation omitted). Rather, it "functions as a guard against extreme malfunctions in the state criminal justice systems." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (internal quotation marks omitted).

A state court's decision is contrary to clearly established federal law when it "applies a rule that contradicts the governing law set forth in [Supreme Court caselaw] or . . . confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (internal quotation marks omitted); *see also Fuentes v. Griffin*, 829 F.3d 233, 244 (2d Cir. 2016). "[C]learly established law as determined by [the Supreme] Court refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (internal quotation marks omitted). Under this standard, a federal court may not issue a writ of habeas corpus simply because it thinks the state court "applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Instead, relief is warranted under section 2254 only

9

"where there is no possibility fair[-]minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 562 U.S. at 102; *see also Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021); *Shinn v. Kayer*, 141 S. Ct. 517, 520 (2020). As the Supreme Court has noted, if this standard is difficult to meet, that is "because it was meant to be." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018) (quoting *Richter*, 562 U.S. at 102); *see also Burt v. Titlow*, 571 U.S. 12, 20 (2013).

## III. DISCUSSION

McCray argues that the New York Court of Appeals unreasonably applied clearly established federal law in finding that the trial court's withholding of the victim's full mental health records did not violate his right to due process under *Brady* and his right to confront his accuser under the Sixth Amendment's Confrontation Clause. We discuss McCray's due process and Confrontation Clause claims in turn.

### A. McCray's Due Process Claim

Due process requires disclosure of evidence that is "favorable to [the] accused" and "material either to guilt or to punishment." *Brady*, 373 U.S. at 87. So-called *Brady* material includes both evidence that is exculpatory and evidence

10

that can be used to impeach a prosecution witness whose credibility may be "determinative of guilt or innocence." *Giglio v. United States*, 405 U.S. 150, 154 (1972). Still, the prosecutor is not obligated to "deliver his entire file to defense counsel." *United States v. Bagley*, 473 U.S 667, 675 (1985) (plurality opinion); *see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[The Supreme Court] ha[s] never held that the Constitution demands an open file policy."). Only evidence that is *material* raises due process concerns. *See Wearry v. Cain*, 577 U.S. 385, 392 (2016) (citing *Brady*, 373 U.S. at 87); *Turner v. United States*, 137 S. Ct. 1885, 1888 (2017).

The "touchstone of materiality" is whether there is a "reasonable probability" that the result of the trial would have been different had the relevant evidence been disclosed to the defendant. *Kyles*, 514 U.S. at 434. A reasonable probability is "the likelihood of a different result [that] is great enough to undermine confidence in the outcome of the trial." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (alterations and internal quotation marks omitted). The materiality of the undisclosed evidence is evaluated "in the context of the entire record." *Turner*, 137 S. Ct. at 1893. Although this determination is "legally simple," it can be "factually complex." *Id.*

11

The relative generality of the *Brady* rule interacts with the habeas standard in a way that is critical to McCray's case. As the Supreme Court has said:

> [T]he range of reasonable judgment may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. . . . The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough*, 541 U.S. at 664. The *Brady* rule is a general rule, as it does not identify specific materials that prosecutors must turn over to defendants, but rather asks – after the fact – whether the failure of those prosecutors to turn over certain evidence denied the defendant a fair trial – a question that is a matter of judgment rather than one with a clear, obvious answer.

McCray contends that "the nondisclosure of the [victim's] full medical records" violated his constitutional rights and constituted an unreasonable application of clearly established federal law, as determined by the Supreme Court. McCray's Br. at 34–35. Specifically, McCray asserts that the New York Court of Appeals incorrectly determined that (1) the trial court had provided him with a sufficient, representative sample of the victim's mental health records, (2) there was nothing in the undisclosed records suggesting that the victim had a tendency to make accusations she knew to be false, and (3) one of the suppressed documents – recounting that the victim had accused her father of sexual assault

12

and that the allegation was unfounded – was immaterial. Because we review the undisclosed evidence not piecemeal but cumulatively, *see Kyles*, 514 U.S. at 440–41, and because we address only the reasonableness of the state court's decision and not its rationale, *see Cruz*, 255 F.3d at 86, all three arguments merge into the first and can be addressed together.

As an initial matter, there is nothing in the Supreme Court's caselaw to suggest that providing only a sample of the victim's mental health records was improper. As noted above, the Supreme Court has "never held that the Constitution demands an open file policy," *Kyles*, 514 U.S. at 437, and not every document that could be used to impeach a witness is so devastating that depriving a defendant of it "undermine[s] confidence in the outcome of the trial," *Smith*, 565 U.S. at 75. Here, much of the victim's file was duplicative of those portions of the file that were produced. Given that redundancy and the fact that many of the documents in the file were otherwise irrelevant to the victim's credibility as a witness, it was not objectively unreasonable or an extreme malfunction of the state's criminal justice system for the state trial court to provide only a representative sample of the victim's mental health records. The question, then, is whether there was material information in the withheld documents. The New

13

York Court of Appeals answered that there was not. We hold that fair-minded jurists could agree with that conclusion.

The twenty-eight pages that were provided to McCray include a remarkable amount of information about the victim, including her history of hospitalizations for mental health episodes; information concerning her memory loss; her hypersexuality and sexually risky behaviors, including her history of sexual activity with older men; her poor judgment in sexual interactions; two previous incidents in which she alleged forced intercourse (one at age twelve with a sixteen-year-old male and one at age fourteen with a twenty-five-year-old male) and reported symptoms of significant trauma; her history of being physically abused by her father; her self-harming behaviors, including one incident where she carved a cross into her hand; her patterns of inappropriate and unsafe behaviors; her poor impulse control; her epilepsy; her psychotic symptoms, which include visual and auditory hallucinations; her violent responses to traumatic flashbacks of prior sexual abuse; the psychotropic medications that she was prescribed, as well as other treatments such as anger management, family therapy, and group therapy that she undertook; her erratic use of prescription medications and inconsistent compliance with her therapy programs; her "bizarre and

14

psychotic behaviors" and mood cycling from depressive to explosive; and her "explosive," "threatening," "aggressive," and even "rageful" behaviors when angry. Sealed R. at 429–55.

In addition to information contained in the pretrial disclosure to McCray, the victim testified on direct examination about her mental health diagnoses and the medications she had been taking at the time of the incident. On cross-examination, she reaffirmed that she had been diagnosed with PTSD and other mental illnesses, and that she had been treated at two different mental health facilities around the time of the events in question. More specifically, the victim testified that one of the reasons she had been receiving bipolar disorder medications was that she could become explosively angry and physically strike others. She conceded that she did not always take her medication and that she could not recall whether she had taken her medication on the night she was raped. She likewise testified that she had engaged in self-harm, including cutting herself, and that the marks the officers found on her arms after the rape were self-inflicted. Finally, the victim testified that she had visualized her deceased grandfather and that there have been times that she could sense the presence of dead people.

It is against this entire record that the state court needed to compare the withheld documents to determine whether they were material. *See Turner*, 137 S. Ct. at 1893. After conducting our own review of the undisclosed records, we conclude that the state court's decision to withhold them from the defense was not an unreasonable application of clearly established federal law. Between the sample provided to McCray and the victim's testimony in open court, McCray had ample material with which to impeach the victim's credibility at trial and more than sufficient information to prompt defense counsel to pursue the victim's mental health as a potential avenue for impeachment. Notwithstanding the victim's serious and tragic struggles with mental illness, the jury still found her to be credible. There is nothing in the undisclosed records that could further impeach the victim to such an extent that our "confidence in the outcome of the trial" would be compromised. *Smith*, 565 U.S. at 75.

McCray argues that our decision in *Fuentes* compels the opposite result. *See* 829 F.3d 233. *Fuentes* was a case in which "the witness's testimony [was] the only evidence that there was in fact a crime." *Id.* at 248. But unlike the defense in this case, the defense counsel in *Fuentes* did not have access to *any* of the witness's relevant mental health records until he came across a "Record of Consultation" as

16

he was leafing through the prosecution's trial exhibits during his summation. *Id.* at 240. At that point, it was far too late for the defense to use that information to impeach the witness. *See id.* at 249. McCray, in contrast, was provided with the victim's mental health records in advance of trial so that his attorneys had a sufficient opportunity to use them in preparing his defense and in cross-examining the victim. The victim also testified about her mental health on direct examination, which gave McCray's attorneys ample material with which to cross-examine her about her mental health condition and how it might affect her credibility. Therefore, *Fuentes* does not undermine our decision here.

The dissent argues that the trial court's decision to provide the twenty-eight-page sample was a "miscarriage" that "is arresting," "unprecedented," and "not easily thinkable." Dissent at 1. According to the dissent, McCray was "wholly denied the right to defend himself" and sentenced "without a trial that anyone can now deem fair." *Id.* at 23. Indeed, the dissent insists the state's defense of McCray's conviction is so "disreputable" that, "[w]ere [Judge Jacobs] a lawyer for the [s]tate, [he] would not have been able to sign the brief it filed on this appeal." *Id.* But whatever the dissent's subjective views on the propriety of signing the state's brief, that is not the standard we are required –

or permitted – to apply on a challenge pursuant to section 2254. Our inquiry is instead an objective one, which turns on whether the undisclosed information was so obviously material that no "fair[-]minded jurist could []agree on the correctness of [the trial court's] decision" to withhold it. *Ritcher*, 562 U.S. at 101 (internal quotation marks omitted). We are not persuaded that this high standard has been met.

First, the dissent argues that the disclosed documents provided the defense with only the broad argument that people with mental illnesses cannot be relied on to tell the truth. Dissent at 4. But the full account of the disclosed documents suggested far more than that. While the dissent states that only a "single disclosed document . . . involves misperception," *id.* at 7, the defense in fact possessed thirteen different documents that touch on a wide variety of issues relating to the victim's potential to misperceive situations: her memory loss, her two previous allegations of forced intercourse and associated trauma symptoms (including violent flashbacks), and her history of psychotic episodes (including visual and auditory hallucinations). Considered in tandem, these documents constituted powerful impeachment materials in and of themselves, which were more than enough to alert defense counsel that the victim's difficulties with accurately

18

perceiving reality could be a productive line of inquiry on cross examination. Not that defense counsel needed prompting – counsel requested the victim's medical history in pretrial discovery and thoroughly cross-examined her at trial regarding how her mental illness might have affected her ability to accurately perceive or remember what happened with McCray in the abandoned house. The assertion that McCray was prevented from mounting a defense based on the victim's "pathological failures to appreciate reality," *id.* at 8, is clearly contradicted by the record.

Second, the dissent makes much of a note in the victim's Patient Care Activity Report stating that she confabulated stories about hospital staff. "Confabulate," in both its dictionary definition and as a technical or psychological term, means "[t]o fill in gaps in one's memory with fabrications that one believes to be facts." *Confabulate*, The American Heritage Dictionary of the English Language (5th ed. 2011); *see also* The American Psychiatric Association, The Diagnostic and Statistical Manual of Mental Disorders 157 (4th ed. 1994) ("DSM-IV") (stating that confabulation is "often evidenced by the recitation of

imaginary events to fill gaps in memory").[2] Clearly, the note indicates that the victim may be an unreliable witness. But so do the documents that were disclosed to McCray, which indicate that the victim had trouble with memory loss and with misperceiving and misremembering events. It was therefore not unreasonable for the New York Court of Appeals to determine that the note in the Activity Report was cumulative of the other impeachment materials that were provided to McCray prior to trial.

Third, the dissent says that two assessments indicating that the victim "cannot remember good experiences if she has bad experiences with someone" were material and should have been disclosed. Dissent at 9. The dissent spins a theory that McCray and the victim shared a good experience – namely, consensual sex in an abandoned building – followed by a bad experience pertaining to a post-coital struggle over money. But nothing in the documents cited by the dissent suggests that the victim was prone to forget good experiences within minutes of experiencing them, as would have had to be the case here, where the victim, sobbing and covered in blood, immediately ran to a payphone to call 911 and

---

[2] We have recognized the DSM-IV, which was the edition of the DSM in effect at the time this note was written, as "an objective authority on the subject of mental disorders." *Fuentes*, 829 F.3d at 249.

report having been raped by McCray. Moreover, those same documents clearly state that when the victim does choose to remember something, her memory is excellent. It is dubious that these ambiguous documents would have been especially helpful to McCray, and it was not unreasonable for the New York Court of Appeals to find that they were cumulative of other evidence that demonstrated the victim's faulty memory and potential unreliability as a witness.

Finally, the dissent notes that the undisclosed records show that the victim accused her father of attempting to rape her by pinning her against a wall and that a mental health professional, without explanation, later deemed that allegation to be unfounded. According to the dissent, this prior allegation could have "damn[ed]" the case against McCray. *Id.* at 11. But the dissent fails to fully or accurately describe either the records at issue or the victim's allegation against McCray. The records state that the victim had alleged that her father tried to rape her by pinning her up against the wall in a sexual position and that she could not recall how she got away. The victim's allegation against McCray, however, was much more detailed and differed in significant respects from the allegations made against her father. The victim testified that once she and McCray were in the abandoned house, McCray backed her up against a wall, forced his tongue down

21

her throat, and began grinding against her. She told him to stop and tried to push him away, but he continued, commanding, "You are going to give it to me or I'm going to take it." *McCray I*, 958 N.Y.S.2d at 515. The victim testified that she punched McCray in the face, near his jaw or chin; that McCray hit her in the face several times and choked her from behind; that she then bit McCray's forearm while he was choking her, all while begging for her life and trying to make noise to draw attention, until she finally gave up and fell to her hands and knees; and that McCray then raped her on the floor of the abandoned house. When it was over and the victim got up to leave, McCray told her, "Don't go out there looking like that." *Id.* at 516. She wiped the tears and blood from her face and then went out the same way they had entered, only to immediately call the police from a payphone and report that she had been raped. The similarities between the two stories are at most superficial and trivial. While the dissent insists that the evidence suggesting that the victim may have misinterpreted her father shoving her as an attempted rape would be "dynamite" to the jury, Dissent at 13, we are not persuaded that there is a "reasonable probability" that the result of the trial

22

would have been different had the evidence been disclosed to McCray. *Kyles*, 514

U.S. at 434.[3]

In sum, the dissent is incorrect to say that the withheld documents would

have corroborated the weaker aspects of McCray's defense in ways the disclosed

documents did not. Dissent at 15. McCray was given a wealth of information in

pretrial disclosures; the victim testified about her various mental health issues in

open court; and the victim was cross-examined vigorously on her mental illness,

her erratic behavior, and – by extension – her reliability. The jury nonetheless

credited her testimony and convicted McCray. Based on the entire record, we

cannot say that no fair-minded jurists would agree with the New York Court of

Appeals that McCray received a fair trial. We therefore deny McCray's petition

insofar as it seeks relief based on *Brady*.

## B.  McCray's Confrontation Clause Claim

The Confrontation Clause of the Sixth Amendment provides that "[i]n all

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

---

[3] The dissent notes that the withheld documents show that the victim experiences flashbacks to being sexually abused. Dissent at 11. While that is true, notes regarding the victim's flashbacks to her prior sexual abuse were also included in the disclosed documents. Thus, any discussion of the victim's flashbacks in the undisclosed documents is duplicative or cumulative of what was disclosed.

the witnesses against him." U.S. Const. amend. VI. Supreme Court caselaw clearly establishes that the Confrontation Clause entitles a criminal defendant to "a meaningful opportunity to cross-examine witnesses against him." *Alvarez v. Ercole*, 763 F.3d 223, 229–30 (2d Cir. 2014); *see also Davis v. Alaska*, 415 U.S. 308, 315 (1974). McCray argues that he was deprived of such an opportunity because the sample of the victim's mental health records provided to him was insufficient. The New York Court of Appeals rejected this argument as a matter of law, concluding that the Confrontation Clause does not extend to pretrial discovery and instead analyzing McCray's claims only in connection with *Brady* and its progeny. *See McCray II*, 23 N.Y.3d at 198.

The view that the opportunity to cross-examine witnesses is meaningful only when the defendant is given adequate pretrial discovery was advanced in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), by Justice Blackmun in his concurrence, *see id.* at 61–66 (Blackmun, J., concurring), and by Justices Brennan and Marshall in their dissent, *see id.* at 66–72 (Brennan, J., dissenting). This, however, was not the view of the plurality, which made clear that the right to confrontation is only "a *trial* right" that "does not include the power to require the pretrial disclosure of

any and all information that might be useful in contradicting unfavorable testimony." *Id.* at 52–53 (plurality opinion).

Other than in *Ritchie*, the Supreme Court has not directly addressed how, if at all, the Confrontation Clause affects pretrial discovery. To the extent that any guidance may be gleaned from other Supreme Court cases, that guidance is consistent with the *Ritchie* plurality's characterization of a defendant's right to confrontation as a trial right only. *See Barber v. Page*, 390 U.S. 719, 725 (1968) ("The right to confrontation is basically a trial right."); *California v. Green*, 399 U.S. 149, 157 (1970); *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Thus, we find no basis to conclude that the New York Court of Appeals's decision concerning McCray's confrontation rights was "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

25

DENNIS JACOBS, Circuit Judge, dissenting:

I respectfully dissent.

In a word-against-word rape case, the State turned over to the defense documents reflecting a variety of mental disorders of the complainant that rendered her vulnerable; but the State did not turn over documents reflecting her distortions of memory and reality, and an earlier report of rape. The withheld documents put the case in a wholly different light, raise powerful doubts about what happened, and would have opened the only promising avenues for investigation and trial strategy.

I acknowledge the high hurdle that a federal court must surmount to grant a writ of habeas corpus in a state case: it must be that the state court's decision was "objectively unreasonable," Fuentes v. Griffin, 829 F.3d 233, 245 (2d Cir. 2016) (quoting Yarborough v. Alvarado, 541 U.S. 652, 665 (2004)), that is, "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," Harrington v. Richter, 562 U.S. 86, 103 (2011). The standard is not often met; but the miscarriage here is arresting and unprecedented. It is not easily thinkable.

1

The facts may be put in skeletal fashion. Terence Sandy McCray and the complainant ended a social evening in 2009 by going to an abandoned house. She says that she was "follow[ing] him" around the premises when McCray pinned her to a wall and raped her. State Ct. R. at 380:7-8, No. 9:15-cv-1129 (N.D.N.Y. Apr. 21, 2016), ECF No. 35-1. He says that they were seeking a private place for sex, and that after consensual sex, she demanded payment, grabbed his pants and fished for cash; and that after a tussle ensued, he fled.

As everyone agrees, the case turns on the credibility of McCray and the complainant. McCray was convicted by a jury in Albany County Court, and sentenced to 22 years in prison—where he has now been for about 13 years. (McCray spurned a plea agreement that would have subjected him to a misdemeanor conviction and time served—which says something about the prosecution's view of its case.) The conviction withstood state appeals by closely divided panels: 3-2 in the Appellate Division, 4-3 in the Court of Appeals.

I would hold that the disposition of the Court of Appeals (after almost all of the exculpatory documents were known to the judges) was "objectively unreasonable." Fuentes, 829 F.3d at 245 (quoting Alvarado, 541 U.S. at 665). I will adduce particulars, but in sum, the Constitutional deprivation under Brady

2

v. Maryland, 373 U.S. 83 (1963) was absolute—that is, none of the many exculpatory documents were turned over.  It was incontestable error to tolerate that denial of the due process right to a fair trial.

The majority deems it "critical to McCray's case" that Brady is a "general rule" that entails "judgment" in deciding what "specific materials" must be turned over, and therefore may not be a viable ground for seeking relief under the habeas standard.  Maj. Op. at 12-13.  That principle would foreclose habeas relief even when—as here—the Brady violation is complete, flagrant, and consequential, which cannot be the law.


**I**

As permitted in New York, the culling of the complainant's (huge) medical file was done by the trial judge; that procedure for the disclosure of confidential documents is sanctioned by both the New York Court of Appeals, see People v. Gissendanner, 48 N.Y.2d 543, 551 (1979); see also People v. Contreras, 12 N.Y.3d 268, 272 (2009), and the United States Supreme Court, see Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987).

The trial judge turned over to the defense (and prosecution) 28 pages out of over 5000 and placed the rest under seal, where they remain, inaccessible to both the defense and the prosecution.  Scrutiny in the state appellate courts, in the district court, and in my chambers identified 45 additional pages that should have been produced.  But the seal order has disabled McCray's counsel from specifying the use and impact of the withheld documents, or how they might have affected trial strategy.  Unless lawyers can see what has been withheld, they are shadow-boxing.

Six appellate judges (albeit out-voted) would grant a new trial.  That includes me.

The New York Court of Appeals (the "Court") wrote off the withheld documents as "cumulative or of little if any relevance to the case."  People v. McCray, 23 N.Y.3d 193, 199 (2014) ("Ct. App. Op.").  Both grounds are manifestly wrong.  The 28 pages that were disclosed demonstrate no more than that the complainant was vulnerable, which was a great boon to the prosecution.  But the defense was left with the insupportable argument that people with mental illness cannot be relied on to tell the truth, or might misperceive a consensual encounter as rape.  As the Court itself recounted, the 28 pages that were produced showed:

4

that the complainant had very significant mental health problems. Her diagnoses, as summarized in her own testimony, included "Bipolar, Tourettes, post-traumatic stress disorder, epilepsy." It was also brought out that she suffered from attention deficit disorder and hypersexuality; that she had reported that she "visualized" or "sense[d] the presence of" dead people; that she had cut her flesh with sharp objects; that her bipolar disorder caused her "on occasion" to be "explosive and angry" and to "physically strike out at people"; that at the time of the incident she was taking medications, was receiving treatment from a mental health facility, and was also seeing a counselor weekly or biweekly; that she failed "once in a while" to take her medications, and that on the night of the alleged rape she could not remember whether she had taken them that day; that, after the alleged rape and before the trial, she had been hospitalized for an overdose of drugs; and that that was not her first suicide attempt, though she said it was her first "serious" one.

Id. at 197–98 (alteration in original).

The complainant's vulnerability, as detailed in the documents known to the jury, was the mainspring of the prosecution's case, as pressed in summation: "something wasn't right about [the complainant]," possibly because of "her mental health conditions." State Ct. R. at 778:12–14, No. 9:15-cv-1129 (N.D.N.Y. Apr. 21, 2016), ECF No. 35-5 ("Prosecutor's Summation"). The prosecutor imputed to McCray the assumption that he could rape her with impunity: "[n]obody's going to believe [the complainant]" because "[s]he's crazy." Id. at 790:22–25. And vulnerability was the prosecution's explanation for why the rape took place in the context of a willing sexual encounter:

5

> I submit to you the plan was not to rape her. The plan was to take advantage of her because he knew he could. And what happened was what he didn't predict or plan, that she said no. She said no. Because she agreed and participated in sexual activity with him before in April and even earlier that night at his friend's house, he figured he was a shoe-in. He had it in the bag. He was going to take her to an abandoned building where he knew it would be private.

Id. at 780:10–19.

The complete defense to all this would have been evidence that the complainant had a distorted memory or a fragile sense of reality. But the disclosed evidence did nothing to support such an argument. There is nothing about Tourette Syndrome, bipolar disorder, PTSD, epilepsy, or attention deficit disorder that renders the complainant an unreliable witness. And hypersexuality (to the extent it is anybody's business) simply reinforces the prosecution's argument that she was vulnerable.

Brady requires the disclosure of evidence that takes on force from "cumulative effect." Kyles v. Whitley, 514 U.S. 419, 440 (1995). Yet the Court considered it sufficient if McCray had documents containing "examples" of the mental health issues that appeared in the withheld documents, and good enough if the withheld documents "were no clearer or more dramatic than the ones the defense already had." Ct. App. Op., 23 N.Y.3d at 199. As example, the Court

6

picked the single disclosed document that involves misperception: the complainant saw or sensed the presence of the dead. The Court deemed this sufficiently representative of her "hallucinations or distorted perceptions." Id. But there are no zombies in this case.

## II

The complainant's withheld medical history reflects memory distortion, misperception, and fabrication that undermine credibility generally and fatally. Since, as Judge Rivera observed in her potent dissent in the New York Court of Appeals (on behalf of three judges), "[c]ases are made or unmade by specifics, not generalities," Ct. App. Op., 23 N.Y.3d at 206 (Rivera, J., dissenting), I will focus on the impact of particular documents that bear upon those features of McCray's testimony that were most in need of corroboration.

In this opinion, withheld documents are cited in italics to avoid repeating endlessly the description, "another record withheld from the defense."

The Court held that the two accounts of what happened at the crucial moment set up a binary choice: either the sex was consensual or it was rape— and it therefore could not be attributed to "a failure of recollection or a misunderstanding." Ct. App. Op., 23 N.Y.3d at 199. But if the defense had in

hand the evidence it was entitled to have, it could have mounted a defense that reconciled the opposite accounts on the basis that both witnesses were telling the truth: one of them with pathological failures to appreciate reality.

As to the alleged rape itself, the withheld documents specifically adduce symptoms that bear directly on the complainant's ability to recall and relate the disputed events. The complainant "has pretty significant short term memory loss." *Oct. 2006 Progress Note.* At times, she has felt "out of control" and afterward "has had no recollection of the events" that took place during the episode. People v. McCray, 958 N.Y.S.2d 511, 524 (3d Dep't 2013) (McCarthy, J., dissenting). She has "confabulat[ed] stories about [hospital] staff." *Nov. 2006 Patient Care Activity Rep.* The "major feature" of confabulation has been described in scientific literature as "an inaccurate and sometimes bizarre narrative account of a present or past event," sometimes characterized as "'honest lying,' in the sense that patients believe what they are saying even though it is demonstrably false." Daniel L. Schacter, Jerome Kagan, & Michelle D. Leichtman, True and False Memories in Children and Adults: A Cognitive Neuroscience Perspective, 1 PSYCH. PUB. POL'Y & L. 411, 415–16 (1995). (The

8

ordinary definition of "confabulation" is set out in the margin.[1])  The

complainant also "has a very poor perception of reality" and distorts her

interpersonal relationships.  *July 2006 Discharge Summ*.

One such distortion of reality has direct bearing on the case.  Withheld

psychiatric assessments, dated about one year apart, reveal that the complainant

has a selective memory.  It is not the kind of selective memory that is fairly

universal; the complainant "cannot remember good experiences if she has bad

experiences with someone."  *Sept. 2007 & Aug. 2008 Assessments*.  Consider:

McCray testified that he and the complainant shared a good experience

(consensual sex) followed by a bad one (a struggle over money).  The evidence of

the complainant's pathology would have thus corroborated McCray's account.

---

[1] To "confabulate" means "to fill in gaps in memory by fabrication," Confabulate,
Merriam-Webster.com, https://www.merriam-
webster.com/dictionary/confabulate (last visited December 14, 2021), or "by a
falsification that one believes to be true," Confabulate, Dictionary.com,
https://www.dictionary.com/browse/confabulate?s=t (last visited December 14,
2021); see Confabulate, Oxford Dictionary,
https://premium.oxforddictionaries.com/us/definition/american_english/confabu
late (last visited December 14, 2021) (defining "confabulate" as "[f]abricate
imaginary experiences as compensation for loss of memory"); see Francis P.
Kuplicki, Fifth, Sixth, and Fourteenth Amendments: A Constitutional Paradigm
for Determining the Admissibility of Hypnotically Refreshed Testimony, 78 J. OF
CRIM. L. & CRIMINOLOGY 853, 856 (1988) (defining "confabulate" as "[to] fill gaps
in [one's] memory with plausible, but not necessarily accurate, data").

Justice McCarthy made the same observation in his dissent in the Appellate Division: "This . . . record could be especially important, considering defendant's testimony that they had consensual sex and struggled afterward when the victim attempted to take his money." McCray, 958 N.Y.S.2d at 525 (McCarthy, J., dissenting).

Judge Rivera's dissent in the Court of Appeals cites this same memory defect as illustrative of how the documents that were disclosed "did not reveal the full range of medical and behavioral issues that implicate the complainant's credibility." Ct. App. Op., 23 N.Y.3d at 208 (Rivera, J., dissenting).

The jury heard from the prosecutor that McCray's account of consensual sex required "believ[ing] him over everything else," Prosecutor's Summation at 783:12–15; but the jury never learned of the psychiatric evidence corroborating McCray's version of events. And there was no "everything else." The physical evidence, as the majority notes, "was consistent with both stories." Maj. Op. at 3.

Testimony about the aftermath was also conflicting. McCray testified that the complainant demanded money after sex, grabbed his pants when he refused, and rifled the pockets for his wallet. She denied this behavior. The withheld documents reflect, however, that "[s]he has developed strategies to get what she

10

wants from people," including by acting impulsively in ways that endanger herself and others, such as by "grabbing the steering wheel when [her] mom is driving . . . ." *July 2008 Clinical Diagnostic Formulation*.

The prosecutor told the jury that someone so disturbed could not also be "manipulative and clear-headed and crafty . . . ." Prosecutor's Summation at 787:8–9. But the withheld documents demonstrate that at the same time the complainant is having delusions she could have a clear enough head to grab what she wanted. This, too, would have corroborated McCray's testimony and subverted the prosecution's theory.

It is damning in a rape case if the defense can show that the complainant had previously made false rape allegations. The withheld documents reveal that, as early as 2004, the complainant reported that her father tried to rape her by pinning her against a wall. That is of course what she claims McCray did when he raped her. Relatedly, the withheld documents show that the complainant experienced flashbacks to being sexually abused. In particular, the withheld documents reflect that she has flashbacks to her father's alleged sexual abuse, and that role playing with her boyfriend would trigger flashbacks.

The Court recognized that the complainant's accusation against her father "provides the strongest basis for [McCray's] argument on appeal," Ct. App. Op., 23 N.Y.3d at 200, but dismissed it for two reasons. First, the Court considered it was "quite different" from the accusation against McCray. Id. But the defense (if armed with the withheld documents) could easily have depicted the allegations as quite similar: she was in the willing presence of an older man, who suddenly pins her to a wall for rape. Second, the Court dismissed the 2004 accusation against her father as too "far removed in time" to be probative of her 2009 accusation against McCray. Id. This was likewise unreasonable. The accusation against her father would have been recent enough for the State to criminally prosecute him;[2] surely it was recent enough to be relevant to McCray's prosecution.

---

[2] Depending on the severity of the crime, New York's statute of limitations for sexual assault ranges from five to twenty years, N.Y. Crim. Proc. Law § 30.10(2)(a-1)–(a-2), 3(e) (McKinney 2019); for rape in the first degree and some other sexual offenses, there is no limitation period, § 30.10(2)(a), and for some sexual offenses committed against children, the limitation period does "not begin to run until the child has reached the age of twenty-three or the offense is reported to a law enforcement agency . . . whichever occurs earlier," § 30.10(f). The complainant would have been about 14 years old when she reported that her father tried to rape her, and she had not yet reached the age of 23 at the time of McCray's trial.

A social worker referred to the allegation that the father attempted rape as "unfounded," *Undated Psych. Assessment*, and the complainant's mother doubted it.[3] But neither was in a position to know; and, much more important, McCray's account would have been strengthened whether her father attacked her, or whether she imagined the attack. If it happened, it would be powerful on cross-examination; if it didn't, it would be dynamite.

"Prior false rape complaints may be admissible when they suggest a pattern casting substantial doubt on the validity of the charges made by the victim or indicate a significant probative relation to such charges." People v. Blackman, 935 N.Y.S.2d 181, 188 (3d Dep't 2011) (quotation marks and citation omitted). Obviously, if the complainant's allegation of rape against her father were false or delusory, the defense would have had no trouble connecting the episode to her encounter with McCray. But defense counsel, having never (even now) seen the documents, had no opportunity to make an offer of proof. In any event, as the Court recognized, even "[i]nadmissible evidence can be material under Brady if it will be useful to the defense, perhaps as a lead to admissible evidence or a 'tool in disciplining witnesses during cross-examination.'" Ct.

_____

[3] Some mentions of the allegation, and the mother's denial, are either highlighted or crossed out.

App. Op., 23 N.Y.3d at 199-200 (quoting <u>United States v. Gil</u>, 297 F.3d 93, 104 (2d Cir. 2002)).

The allegation against the complainant's father, whether it was true or not, would have been critical to the defense because it would have explained how the complainant might *truthfully* testify to a rape that *did not happen*—as she would if she had a flashback to her father's sexual abuse during a consensual encounter with McCray, just as (according to another withheld document) flashbacks were triggered by consensual sex with her boyfriend. Moreover, given her documented history of confabulation and significant memory distortion, defense counsel would have been able to explain that her memory gaps from the night in question were filled by details from her father's sexual abuse; or, alternatively, that she compensated for short-term memory distortion by confabulating details quite apart from her history with her father.

The prosecutor told the jury that the complainant's testimony could not possibly have been "fantasy." Prosecutor's Summation at 778:1. The Court adopted this false assumption, reasoning that the complainant "certainly did not fantasize or misremember that she and defendant had a violent encounter: they both had the wounds to prove it. And their descriptions of that encounter are so

14

starkly different that if one version is not a lie, the other must be." Ct. App. Op. at 199. But McCray testified to a violent tussle over money; so wounds do not discredit his account. Much more important: the Court failed to recognize—and the jury never learned—that the complainant's version of events may have resulted from a pathological misperception of the truth, rather than a lie.

At the risk of being obvious, the withheld documents would have corroborated the weaker specifics of McCray's testimony: the complainant's sudden turning on a person with whom she was in a sexual encounter, her perception of consensual sex as rape, her impulsive grab to get the cash from his pants. The withheld documents would have allowed jurors to reconcile the conflicting accounts, treating his as true and hers as sincerely held delusion.

### III

"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). Taken together, the

15

withheld documents subvert the reliability of the complainant's testimony and would have turbocharged her cross-examination. As Judge Lynch has explained:

> It is the role of the jury, fairly appraised of the facts then known, to weigh the strengths and weaknesses of the evidence before them, bearing in mind the inherent limitations on the victim's ability to observe, remember, and report what he saw. . . . The justice of relying on the jury's conclusion, however, depends critically on the assumption that the jury knew all of the relevant facts . . . .

Poventud v. City of New York, 750 F.3d 121, 140 (2d Cir. 2014) (in banc) (Lynch, J., concurring).

**IV**

One apparent cause of the Court's error was a failure to consider the withheld documents in the way practicing lawyers would: as springboards for investigation, as a mine for cross-examination, and as tools for shaping trial strategy. In short, the Court failed to recognize the dynamic force of disclosure in the hands of a lawyer.

Defense counsel armed with the withheld documents would not have been limited to waving the pieces of paper in front of the jury. The power of such documents is multiplied by their potential to corroborate, to direct investigation, and to develop the defense theory of the case. It is not for the State (whether

16

prosecutor or judge) to pick which of these documents that bear on the sole issue at trial would enable defense counsel to defend the client. If three documents out of 5000 contain similar information, defense counsel might seek to admit all three, or select the most salient one—or present none of them to the jury and instead mine them for investigative leads. Brady material thus includes evidence that supports a viable defense strategy. "The records that indicate an inability to remember and potential history of fabrication would have been critical to the defendant's preparation and cross-examination of the complainant." Ct. App. Op., 23 N.Y.3d at 209 (Rivera, J., dissenting).

Accordingly, in Fuentes v. Griffin, 829 F.3d 233 (2d Cir. 2016)—another word-against-word rape case—we granted the writ, ruling that the New York Court of Appeals' application of Brady "was objectively unreasonable" because it failed "to make a reasonable assessment of the benefits to the defense of exploring [the complainant's] mental state as revealed in the [withheld psychiatric document]." Id. at 250. In that case, the complainant alleged that Fuentes raped her on the roof of her apartment building. Id. at 237. It was undisputed that some sexual encounter occurred on the roof; so, as here, "the issue for trial was whether the sex was consensual." Id. Thus, as here, the

17

complainant's (credible) testimony was essential to the prosecution's case. Id. at 250–51.

The (single) suppressed document in Fuentes revealed that the complainant had been depressed and suicidal for two years before the alleged rape; and that she had a disorder that causes "feelings of inadequacy," "excessive anger," and "chronic mood symptoms [that] may contribute to interpersonal problems or be associated with distorted self-perception." Id. at 249 (quotations omitted). Because the trial testimony "presented two diametrically opposing versions of what happened," the key issue was the complainant's "motivation for accusing Fuentes of engaging in conduct to which she had not consented; and the [withheld document] was pertinent to the issue of her motivation because it identified a relevant mood disorder." Id. at 252. The Court's decision was objectively unreasonable both because "the jury could well have given greater credence to Fuentes's version of the events" if it had known the complainant's psychiatric history, and because disclosure would have enabled defense counsel "to develop this line of defense further." Id.

Similarly, the non-disclosure here prevented counsel from developing an effective line of defense. The central issue with the complainant's credibility was

her delusion and distorted perception. But the majority opinion conflates impairment of memory with delusion: the difference is between forgetting something and remembering something that did not happen.

The withheld documents would fuel a powerful defense theory of the case, as well as an impeachment strategy, neither of which could be viable based on the disclosed documents alone. When the State "has a witness's psychiatric records that are favorable to the accused because they provide material for impeachment, those records fall within Brady principles, and that the Supreme Court has so recognized." Id. at 247. The majority opinion considers arguments made in this dissent, and engages with them, but that exercise underscores that McCray's own lawyers cannot advance arguments based on the undisclosed documents because they still have not seem them.

The district court observed that the approximately 5000 pages of records contain just a single mention of confabulation. The district court considered that that was not much; but it is a great gift in a case that is all about credibility; and a competent lawyer would conclude from the single notation that investigation would be promising. Armed with the knowledge that the complainant had previously confabulated stories, defense counsel could have sought elaboration

19

from the note's author and others who treated her or knew her. Without timely pre-trial access to the withheld documents, McCray's counsel was prevented from doing the job. Judge Rivera amplified this point in a compelling passage:

> [I]n response to the prosecution's strategy of characterizing the defendant as a manipulative, older man seeking to take advantage of a younger woman who acted in a sexually provocative manner, and who he could see suffered from some type of mental impairment, the defendant had to persuade the jury that the complainant's mental health conditions would have led her to fabricate a story of a rape, or to cause her to believe and recount for the jury an incorrect version of the sexual encounter with the defendant. In that sense, the more the defendant sought to establish the general severity of the complainant's mental health conditions, the more the jury could find persuasive the People's version. Thus, in order for the defendant to present the complainant's mental health condition objectively from the defense point of view—that she is too mentally ill to recall that she consented, or that she made up the whole story because of her illness—disclosure of records about her ability to recall events accurately and her capacity to fabricate events was crucial.

Ct. App. Op., 23 N.Y.3d at 211 (Rivera, J., dissenting).

## V

It was the trial court that reviewed the complainant's medical file and made the initial error of nondisclosure. The Court of Appeals unreasonably reviewed the trial court's violation as a matter of discretion. See Ct. App. Op., 12 N.E.3d at 1081 ("In sum, the issue here is whether the trial court abused its

20

discretion in finding defendant's interest in obtaining the records to be outweighed by the complainant's interest in confidentiality . . . ."). Federal law affords no "discretion" to withhold evidence that is constitutionally required to be produced. The question is one of due process. See Brady, 373 U.S. at 87. And there is no allowable discretion to deprive a criminal defendant of his right to due process.

**VI**

The State now doggedly defends a conviction that it obtained thanks to a violation of due process. True, the initial mistake here was made by the trial judge. With 5000 pages of a medical file, the process of review somehow broke down. The critical documents were withheld from the prosecution as well as the defense. But after the trial, the successive state courts and the district court—and now my chambers—found documents that "put the whole case in . . . a different light" and "undermine confidence in the verdict." Banks v. Dretke, 540 U.S. 668, 698 (2004) (quoting Kyles, 514 U.S. at 435). A prosecutor who knowingly did what the trial judge did would be a menace. But good faith is irrelevant under Brady, 373 U.S. at 87, and functionally, there is no difference between an error by

21

the trial judge and a dirty deed by a prosecutor: the State has deprived the

defendant of a fair trial.  To McCray, in jail for 22 years, it is all one.

It is emphatically the role of the prosecutor to correct a radical deficiency

in a prosecution even after the exhaustion of appeals.  The prosecution's interest

"is not that it shall win a case, but that justice shall be done."  Turner v. United

States, 137 S. Ct. 1885, 1893 (2017) (quoting Kyles, 514 U.S. at 439).

In Warney v. Monroe County, 587 F.3d 113 (2d Cir. 2009), an assistant

district attorney ("ADA") took the initiative post-trial to obtain DNA results that

cleared the defendant, and later was sued by the defendant for failing to disclose

the results to defendant's counsel for three months, id. at 118–20.  We held that

the ADA was immune from suit because correcting a bad conviction is integral to

a prosecutor's role as an advocate.  Id. at 122–24.  We reasoned: "[t]he DNA

testing obviously would have bearing on the advocacy work of deciding whether

to oppose Warney's [post-trial] initiatives" because "[a] prosecutor has an

affirmative obligation, before filing an opposition, to ensure that the petition

should in fact be opposed."  Id. at 124.

On this present appeal, the majority has rigorously applied principles of

finality and deference.  But those principles and constraints in no way bind a

prosecutor. A prosecutor who continues to enjoy a misbegotten victory is as much a menace as one who contrives it. Here, the Attorney General knows from successive appellate opinions that McCray, who is still in prison, was wholly denied the right to defend himself. Yet the Attorney General labors hard to maintain the advantage. The result here is that a person is more than halfway through a 22-year prison sentence, without a trial that anyone can now deem fair, and he is still without the opportunity to see the documents that could have acquitted him. I don't know what happened in that abandoned house; but it is clear what is happening here. This is a sinister abuse. The last-ditch defense of such a conviction by the Attorney General is disreputable. Were I a lawyer for the State, I would not have been able to sign the brief it filed on this appeal.